UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| Chevron U.S.A. Inc., | |
| *Plaintiff,* | Civil Action No. ̲1̲:̲1̲9̲-̲c̲v̲-̲3̲53-LG-RHW |
| v. | |
| Ted (Darin) Matthews | Jury Trial Demanded |
| *Defendant.* | |

## **Complaint**

1.     This is an action to recover damages and disgorgement of ill-gotten gains from Ted (Darin) Matthews for fraud, negligent misrepresentation, conspiracy, unjust enrichment, and conversion.  For years, Matthews abused his position as Operations & Maintenance Supervisor at Chevron U.S.A.'s Pascagoula Refinery to line his own pockets to the detriment of Chevron U.S.A.  Rather than follow Chevron U.S.A.'s procurement policies, Matthews awarded contracts to personal friends and to those contractors willing to pay him kickbacks or otherwise provide personal favors.  Because of his actions, Matthews profited at Chevron U.S.A.'s expense—Chevron U.S.A. paid millions for contracts that were obtained in violation of its policies, in various overcharges, and in charges for services never provided, all while Matthews's lined his own pockets and used his ill-gotten funds to acquire assets, including but not limited to recreational vehicles, boats, and real estate..

## Parties

2.      Plaintiff Chevron U.S.A. Inc. is a Pennsylvania corporation with its principal place of business in San Ramon, California.  At all times relevant, Chevron U.S.A. operated a petroleum refinery in Pascagoula, Mississippi.

3.      On information and belief, Defendant Ted (Darin) Matthews is a citizen of Mississippi and resides at 12620 Highway 613, Moss Point, Mississippi (Jackson County).  At all times relevant, Matthews worked as the Operations & Maintenance Supervisor at Chevron U.S.A.'s Pascagoula Refinery until Chevron U.S.A. terminated Matthews on July 11, 2016.

## Jurisdiction and Venue

4.      This court has subject-matter jurisdiction over the state-law claims asserted in this complaint under 28 U.S.C. § 1332 because Chevron U.S.A. and Matthews are citizens of different states and the amount in controversy exceeds $75,000.

5.      The court has personal jurisdiction over the parties.  Plaintiff Chevron U.S.A. consented to personal jurisdiction by filing suit here, and Defendant Darin Matthews is a resident of Mississippi.

6.      Venue is proper under 28 U.S.C. § 1391 because Matthews "resides" in this judicial district and because a substantial proportion of the events giving rise to the claims asserted in this complaint occurred in this district.

## Facts

7.      Situated on over 3,000 acres adjacent to the Mississippi Sound, Chevron U.S.A.'s Pascagoula Refinery is one of the largest and most modern refineries in the industry.  The refinery processes crude oil to make gasoline, diesel, jet fuel, and myriad other products.  Since 1980, Chevron U.S.A. has invested more than $2 billion in expansions and improvements to the refinery, which employs thousands of people in Mississippi.

8.      Darin Matthews, a former Chevron U.S.A. employee, was the long-time Operations & Maintenance Supervisor for Chevron Business and Real Estate Services at the Pascagoula Refinery.  In that role, Matthews had the authority to award contracts for extensive work at the refinery.  Upon information and belief, Matthews was the requestor of service orders and/or had approval authority for 70 contractors, 22 of whom Chevron has paid more than $1 million each since 2006.

9.      But for at least ten years, and until he was terminated in July 2016, Matthews used his authority to award lucrative contracts to his friends or to contractors willing to perform personal favors and/or pay him kickbacks and cause Chevron U.S.A. to pay those contractors and friends for work that was never performed.  He did this by concealing personal relationships with contractors in violation of Chevron U.S.A.'s procurement policies because he knew that, if those relationships were disclosed, Chevron U.S.A. would scrutinize his actions and discover his kickback scheme, by approving invoices for work that he knew was not performed, by directing contractors to overcharge Chevron U.S.A. and approving the

3

overcharges for payment, and by directing subcontractors to create fake invoices (for work that was never performed) and submit those fake invoices to contractors, who then passed through the fake charges to Chevron U.S.A. and received payment from Chevron U.S.A..

### A. Chevron U.S.A.'s Conflict-of-Interest Policy

10.     Like many companies that use contractors, Chevron U.S.A. has extensive policies governing the process for selecting contractors and awarding contract work.  Procurement policies help ensure that a Chevron U.S.A. obtains services in a competitive environment and that the prices it pays are fair and reasonable.

11.     One Chevron U.S.A. policy that governed Matthews's interactions with contractors is a prohibition on employees engaging in conduct that might present a conflict of interest.  The policy states:

> It is Company policy that employees may not engage in any activities which conflict with the Company's business interests, which adversely affect the Company's reputation or relations with others, or which interfere with the fulfillment of the responsibilities of the employee's job, which at all times must be in the best interests of the Company. Employees may not use their position or influence; information to which they have access as a result of their employment; or Company assets or resources for their personal gain, or for the improper benefit of others.

12.     As relevant here, that policy prohibits an employee from "us[ing] their position or influence . . . for their personal gain, or for the improper benefit of others."  The policy thus prohibits employees from using their position at Chevron U.S.A. to receive personal favors (including kickbacks) from others, or for favoring

those with whom they have a personal relationship, rather than competitively sourcing contracts.

13.     Matthews was aware of this policy, and like all Chevron U.S.A. employees received annual notice of and training on the policy.

**B. Matthews Hid His Conflict-of-Interest Relationships To Avoid Scrutiny by Chevron U.S.A.**

14.     From 2006 until he was terminated in July 2016, Matthews violated the Conflict of Interest policy to commit fraud and to enrich himself at Chevron U.S.A.'s expense.

15.     Matthews concealed his fraudulent conduct from Chevron U.S.A., and Chevron U.S.A. was forced to expend significant resources investigating Matthews's the nature and extent of Matthews's fraud.

16.     Chevron U.S.A.'s investigations revealed that Matthews used his position for his personal gain or for the benefit of his friends in two ways.  First, Matthews awarded contracts to his friends or those willing to pay kickbacks and/or perform personal favors for him—such as requiring would-be contractors to do work for Matthews at his residences and rental properties.  Upon information and belief for example, Matthews had contractors for Chevron U.S.A. make HVAC repairs and servicing, provide landscaping services, and provide pest-control services at his home and other rental properties.  Matthews either did not pay for these services with the express or implied understanding that the contractor's performance would lead to the contractor receiving work at the refinery, or Matthews provided contractors with codes to use to charge the services at Chevron U.S.A.'s expense.

17.     Matthews and the contractors hid these conflict-of-interest relationships from Chevron U.S.A. because he knew that, if they were disclosed or revealed, Chevron U.S.A. would scrutinize his actions and discovery his fraudulent and tortious schemes.

18.     Matthews failed to disclose his conflict of interest relationships, in violation of Chevron U.S.A.'s policies, and hid his fraudulent conduct from Chevron U.S.A.  As a result, Chevron U.S.A. had no way of knowing through the ordinary course of business that Matthews was (1) violating its Conflict of Interest policy, (2) steering work towards contractors with whom he had a personal or business relationship, (3) instructing contractors (including subcontractors) to bill Chevron U.S.A. for services not provided or that contained markups, or (4) approving invoices he knew to be fraudulent.

19.     Matthews also took steps to hide his fraudulent conduct from Chevron U.S.A.'s other employees. Fraud in billing procedures and undisclosed personal relationships are already difficult for a company to detect, but Matthews ensured that other employees did not have insight in his actions.  For instance, on a number of occasions, Matthews's supervisor directed Matthews to add someone else to the procurement approval process so that Matthews was not the sole reviewer and approver of invoices, but Matthews knowingly ignored these instructions.

### C. Matthews Caused Chevron U.S.A. to Pay Contractors and Subcontractors For Work that Was Never Performed.

20.     Second, Matthews worked with contractors to submit fraudulent billings to Chevron U.S.A., and the contractors would then give Matthews a kickback payment from those fraudulent billings.

21.     Matthews's fraudulent billing scheme included approving invoices for work that he knew the contractors had not performed, directing contractors to pad invoices and overcharge Chevron U.S.A. and then approving the overcharges for payment by Chevron U.S.A., and directing subcontractors to create fake invoices (for work that was never performed) and submit those fake invoices to contractors, who then passed through the fake charges to Chevron U.S.A. and received payment from Chevron U.S.A.  Each time that Matthews directed, submitted, or approved one of these invoices, he represented to Chevron U.S.A.—or caused another party to represent to Chevron U.S.A.—that the invoiced work had been performed for Chevron U.S.A.'s benefit.  Those representations were false, but Chevron U.S.A. rightfully relied on them and paid the amounts billed.

22.     On information and belief, contractors participated in these schemes for their own enrichment, and because they were "scared" of Matthews and had to "play ball" with Matthews to receive work from Matthews at the refinery.

23.     The following paragraphs set forth examples of Matthews's fraudulent conduct and some of the contractors he worked with to carry out his scheme.

*Williams Scotsman and C&I Maintenance*

24.     Between 2008 and 2016, Williams Scotsman was one of Chevron U.S.A.'s largest contractors at the Pascagoula Refinery.  Williams Scotsman supplied modular office units, washrooms, tool units, containers, and associated steps.  Williams Scotsman also provided repairs and maintenance services for the office units and HVAC systems.

25.     Williams Scotsman and Chevron U.S.A. entered into three agreements for these services.  The first agreement ran from October 1, 2008 through March 31, 2013, the second from April 1, 2013 through March 1, 2016, and the third agreement started on March 1, 2016.  All three agreements prohibited Williams Scotsman's employees, subcontractors, and vendors from receiving "any commission, fee, or rebate, or any gift or entertainment of significant cost or value" from a Chevron U.S.A. employee, or from "enter[ing] into any business arrangement with any . . . employee of Chevron."

26.     Nevertheless, neither Matthews nor Williams Scotsman disclosed that Matthews had personal relationships with Williams Scotsman's employees and subcontractors, or that Matthews used Williams Scotsman's employees and subcontractors for personal favors.  Instead, Matthews and Williams Scotsman leveraged those relationships at Chevron U.S.A.'s expense.

27.     Among other things, Matthews and Williams Scotsman colluded to (a) pass off employees of subcontractors such as C&I Maintenance as Williams Scotsman employees to enable Williams Scotsman to charge Chevron U.S.A. for

8

work Williams Scotsman did not actually perform; (b) overcharge Chevron U.S.A. for maintenance and repairs that were already included in monthly lease rates; (c) double bill Chevron U.S.A. for subcontractor services already performed and billed under separate billing relationships with Chevron U.S.A.; and (d) otherwise charge Chevron U.S.A. for work not actually performed.

28.     For instance, Matthews directed Williams Scotsman to hire subcontractors working for C&I Maintenance, a company owned and operated by George Bragg and Josh Bragg.  Matthews and the Braggs are personal friends.  The Braggs used their relationship with Matthews to obtain extensive work from Chevron U.S.A. in violation of Chevron U.S.A.'s Conflict of Interest policy. Matthews knowingly failed to disclose this personal relationship to Chevron U.S.A., and he approved invoices from C&I Maintenance and the Braggs knowing they were submitted in violation of Chevron U.S.A.'s policies.  In particular, Matthews and Williams Scotsman's Operation Manager, Vernon Parker, agreed that WSI would hire C&I Maintenance employees and portray them to be Williams Scotsman employees rather than use actual Williams Scotsman employees.  C&I Maintenance would then bill Williams Scotsman for this work, and Williams Scotsman would in turn mark up these invoices by as much as 25 percent before submitting to Chevron U.S.A. to be paid.

29.     Matthews also conspired with C&I Maintenance and George Bragg to create fictitious invoices for C&I Maintenance for work never performed.  Matthews would then require George Bragg to submit those invoices to Williams Scotsman,

and Williams Scotsman would in turn pass those charges to Chevron U.S.A.  And once paid, Bragg would give Matthews a portion of the payment as a kickback.  On information and belief, after Bragg submitted one of these fictitious invoices to Williams Scotsman, he called another subcontractor to complain about being forced to pay kickbacks to Matthews in order to continue to get work at the refinery.

30.     The fraud did not stop there.  Williams Scotsman further leveraged those relationships to methodically overcharge Chevron U.S.A. for many years.  For example, Williams Scotsman would mark up bills for services by subcontractors by as much as 25 percent before submitting the invoice to Chevron U.S.A. for payment.  Matthews approved these marked-up invoices, even though markups were not permitted by any of the Agreements between Chevron U.S.A. and Williams Scotsman and even though Matthews knew the charges were fraudulent.  From January 2013 through August 2016, these improper markups totaled at least $782,074.

31.     Between October 2008 and March 2013, Matthews also worked with Williams Scotsman to double-bill Chevron U.S.A. for services that were included in a monthly rental rate.  These overcharges exceeded $3 million

32.     Finally, Matthews and Williams Scotsman colluded to bill Chevron U.S.A. for services that were never provided.  Under Chevron U.S.A.'s agreement with Williams Scotsman, Williams Scotsman provided two full-time crews of subcontractors (six persons in total, approximately 1,049 hours per month) for any on-demand work needed at the Pascagoula Refinery.  The agreements provided that

Williams Scotsman could bill Chevron U.S.A. for any work in excess of this amount, which Williams Scotsman did.  But these charges were false.  The gate logs at the Pascagoula Refinery showed that the two full-time crews were present and working at the refinery substantially less than the contractually required 1,049 hours per month.  In fact, between April 2013 and March 2016, Williams Scotsman overbilled Chevron U.S.A. for 17,603 hours, totaling at least $880,127 in overcharges.

*John Thompson and John Thompson & Associates*

33.    John Thompson and his HVAC maintenance-and-repair company, John Thompson & Associates, were also a part of Matthews's schemes.  Between 2009 and 2016, Chevron U.S.A. expended more than $8.2 million on contracts with John Thompson & Associates to conduct HVAC maintenance and repair work, including on Williams Scotsman trailers at the refinery.

34.    John Thompson and Chevron U.S.A. entered into service agreements for this work in July 2009, July 2012, and July 2015.  Like Chevron U.S.A.'s service agreement with Williams Scotsman, the agreements prohibited conflicts of interest.  Under all three agreements, no employee or subcontractor of John Thompson "shall give to or receive from any . . . employee . . . of Chevron . . . any commission, fee, or rebate, or any gift or entertainment of significant cost or value . . . or enter into any business arrangement" with a Chevron U.S.A. employee.

35.    Thompson and Matthews had a personal relationship outside of work that was unknown to Chevron U.S.A. during Matthews's employment.  And despite knowing that this personal relationship violated Chevron U.S.A.'s policies and

11

Thompson's contract with Chevron U.S.A., Matthews failed to disclose this relationship yet nevertheless steered work to Thompson and approved invoices submitted by Thompson.

36.     Capitalizing on that relationship, Matthews and Thompson defrauded Chevron U.S.A. by $3 million between July 2009 and September 2015.

37.     As one example, Matthews instructed John Thompson & Associates to increase their crew staffing from one crew to three crews—without obtaining approval through Chevron U.S.A.'s procurement process.  Thompson billed Chevron U.S.A. for work by these unapproved crews.

38.     Matthews also approved invoices from John Thompson & Associates that had unsupported markups and/or other billings greater than the contracted-for amounts.  Thompson overcharged Chevron U.S.A. for monthly preventive maintenance, and it billed Chevron U.S.A. for services without providing any detail or support for those services.  Between 2006 and 2016, these overcharges exceeded $2.5 million.  During the same period, Thompson also double-billed Chevron U.S.A. for maintenance work on HVAC systems, ice makers, refrigerators, and freezers. Not only did Thompson directly bill Chevron U.S.A. for those services, but Thompson also billed those charges to Williams Scotsman, which in turn then billed Chevron U.S.A. with as much as a 25-percent markup.

39.     Matthews also required potential contractors to do work for him, either for free, at the expense of the potential contractors, or at Chevron U.S.A.'s expense, to bid on contracts.  For instance, upon information and belief, Matthews asked

Thompson to install or maintain HVAC equipment on his personal and/or rental homes and Thompson either provided the work for free or Matthews gave Thompson a charge number to use at Chevron U.S.A.'s expense.

## Count I
**(Fraud)**

40.     Chevron U.S.A. repeats and realleges paragraphs 1 through 39 above, as if set forth in full here.

*Fraudulent Approval of Contractors*

41.     At all times, Matthews requested service orders and/or had approval authority for 70 contractors, including Williams Scotsman, C&I Maintenance, and John Thompson and John Thompson & Associates, Inc.

42.     When Matthews approved Williams Scotsman, C&I Maintenance, John Thompson and John Thompson & Associates, Inc., and other contractors to perform work for Chevron U.S.A., he represented to Chevron—either expressly or implicitly—that the contractors complied with Chevron U.S.A.'s procurement policies, including that they were being approved on their merits and not because of their personal relationship with Matthews or their involvement in a fraudulent scheme with Matthews.

43.     Chevron U.S.A. had a right to rely on the representations of Matthews, its employee.

44.     In the case of each of the contractors, Matthews's representations to Chevron U.S.A. were false, and he knew they were false: in reality, those contractors were Matthews's friends, had performed personal favors for Matthews

at their own or Chevron U.S.A.'s expense, or had paid Matthews kickbacks, all in violation of Chevron U.S.A.'s policies.

45.    Matthews's false representations were material, as Chevron U.S.A. would not have allowed the contractors to perform work for or receive payment from Chevron U.S.A. without Matthews's approval.

46.    Matthews intended for Chevron U.S.A. to rely and act on his false representations by allowing the contractors to perform work and receive payment from Chevron U.S.A. when otherwise Chevron U.S.A. would have rejected them.

47.    Chevron U.S.A. did not know and could not have known that Matthews's representations were false, as Matthews and the contractors actively hid their relationships and fraudulent scheme from Chevron U.S.A. and its other employees.

48.    Matthews's false representations caused Chevron U.S.A. injury by causing Chevron U.S.A. to allow contractors who should have been precluded from working at the refinery due to their personal relationship with Matthews and fraudulent intentions against Chevron U.S.A.

*Fraudulent Approval of Invoices*

49.    At all times, Matthews approved invoices for Williams Scotsman, C&I Maintenance, John Thompson and/or John Thompson & Associates, Inc., and other contractors.

50.    When Matthews approved invoices submitted by Williams Scotsman, C&I Maintenance, John Thompson and/or John Thompson & Associates, Inc., and

other contractors, he represented to Chevron U.S.A.—either expressly or implicitly—that the invoices were accurate, that the work invoiced had actually been performed, and that the amounts invoiced had been earned and were proper under the agreement between Chevron U.S.A. and the particular contractor.

51.     Chevron U.S.A. had a right to rely on the representations of Matthews, its employee.

52.     Matthews repeatedly and knowingly approved fraudulent invoices that he knew were padded (with improper mark ups) or were being submitted for work that was never provided by the contractor.

53.     Matthews's false representations, made through the act of approving fraudulent invoices, were material, as Chevron U.S.A. would not have paid the invoices had it known that they included fraudulent charges.

54.     Matthews intended for Chevron U.S.A. to rely and act on his false representations by paying contractors excessive mark ups that were not earned or allowed under their agreements with Chevron U.S.A. and by paying contractors for work that was never performed.

55.     Chevron U.S.A. did not know and could not have known that Matthews's representations were false, as Matthews alone approved the fraudulent invoices.

56.     Matthews's false representations caused Chevron U.S.A. injury by causing Chevron U.S.A. to pay contractors excessive mark ups that were not earned

or allowed under their agreements with Chevron U.S.A. and by paying contractors for work that was never performed.

*Fraudulent Directives to Submit False Invoices*

57.    On multiple occasions, Matthews also directed and caused C&I Maintenance, John Thompson and/or John Thompson & Associates, Inc., and other contractors, to submit fraudulent invoices for work that was never performed to Williams Scotsman, and then directed and caused Williams Scotsman to pass through those fraudulent invoices to Chevron U.S.A. for the purpose of receiving payments that were not earned or due under Williams Scotsman's or any other contractor's agreement with Chevron U.S.A.

58.    Chevron U.S.A. had a right to rely on the representations of Matthews, its employee, and Williams Scotsman, one of its contractors, that the work invoiced was actually performed.

59.    Matthews repeatedly and knowingly directed Williams Scotsman to submit fraudulent invoices to Chevron U.S.A., and Williams Scotsman repeatedly and knowingly did submit fraudulent invoices to Chevron U.S.A. for work that Williams Scotsman knew had not been performed.

60.    Matthews's and Williams Scotsman's false representations, made through the act of submitting fraudulent invoices, were material, as Chevron U.S.A. would not have paid the invoices had it known that the work invoiced had not been performed.

61.     Matthews and Williams Scotsman intended for Chevron U.S.A. to rely and act on their false representations by Williams Scotsman for work that was never performed.

62.     Chevron U.S.A. did not know and could not have known that Matthews's and Williams Scotsman's representations were false.

63.     Matthews's and Williams Scotsman's false representations caused Chevron U.S.A. injury by causing Chevron U.S.A. to pay for work that was never performed.

### *Injuries from Fraudulent Conduct*

64.     As a result of Matthews's false representations, Chevron U.S.A. suffered consequent and proximate injuries of an amount to be determined by trial.

65.     Since Matthews committed actual fraud, Chevron U.S.A. is entitled to punitive damages.  *See* Miss. Code Ann. § 11-1-65.

## <u>Count II</u>
### (Negligent Misrepresentation)

66.     Chevron U.S.A. repeats and realleges paragraphs 1 through 39 above, as if set forth in full here.

### *Negligent Approval of Contractors*

67.     At all times, Matthews requested service orders and/or had approval authority for 70 contractors, including Williams Scotsman, C&I Maintenance, and John Thompson and/or John Thompson & Associates, Inc.

68.     When Matthews approved Williams Scotsman, C&I Maintenance, John Thompson and John Thompson & Associates, Inc., and other contractors to perform

work for Chevron U.S.A., he represented to Chevron U.S.A.—either expressly or implicitly—that the contractors complied with Chevron U.S.A.'s procurement policies, including that they were being approved on their merits and not because of their personal relationship with Matthews or their involvement in a fraudulent scheme with Matthews.

69.     Chevron U.S.A. had a right to rely on the representations of Matthews, its employee, and did reasonably rely on those representations.

70.     As an employee of Chevron U.S.A. who was aware of its policies regarding contractors, Matthews had a duty to inform Chevron U.S.A. of his personal relationships and fraudulent schemes with the contractors that he approved to work for the Chevron U.S.A.

71.     In the case of each of the contractors, Matthews's misrepresented or failed to inform Chevron U.S.A. that the contractors were Matthews's friends, had performed personal favors for Matthews at their own or Chevron U.S.A.'s expense, or had paid Matthews kickbacks, all in violation of Chevron U.S.A.'s policies.

72.     Matthews's misrepresentations and omissions were material, as Chevron U.S.A. would not have allowed the contractors to perform work for or receive payment from the Chevron U.S.A. without Matthews's approval.

73.      Matthews's misrepresentations and omissions injured Chevron U.S.A. by inducing it to allow contractors who should have been precluded from working at the facility due to their personal relationship with Matthews and fraudulent

intentions against Chevron U.S.A. and caused Chevron U.S.A. to pay those contractors for work that was never performed.

*Negligent Approval of Invoices*

74.     At all times, Matthews had or asserted the authority to approve invoices for Williams Scotsman, C&I Maintenance, John Thompson and/or John Thompson & Associates, Inc., and other contractors.

75.     When Matthews approved invoices submitted by Williams Scotsman, C&I Maintenance, John Thompson and John Thompson & Associates, Inc., and other contractors, he represented to Chevron U.S.A.—either expressly or implicitly—that the invoices were accurate, that the work invoiced had actually been performed, and that the amounts invoiced had been earned and were proper under the agreement between Chevron U.S.A. and the particular contractor.

76.     Chevron U.S.A. had a right to rely on the representations of Matthews, its employee, and did reasonably rely on those representations.

77.     Matthews repeatedly misrepresented or failed to inform Chevron U.S.A. that the invoices he approved were padded (with improper mark ups) or were being submitted for work that was never performed by the contractor.

78.     Matthews's misrepresentations and omissions were material, as Chevron U.S.A. would not have paid the invoices had it known that they included excessive charges and charges for work that was never performed by the contractor.

79.     Matthews's misrepresentations and omissions injured Chevron U.S.A. by causing Chevron U.S.A. to pay contractors excessive mark ups that were not

earned or allowed under their agreements with Chevron U.S.A. and by paying contractors for work that was never performed.

80.     As a result of Matthews's material misrepresentations and omissions, Chevron U.S.A. suffered consequent and proximate injuries of an amount to be determined by trial.

### Count III
### (Civil Conspiracy)

81.     Chevron U.S.A. repeats and realleges paragraphs 1 through 39 above, as if set forth in full here.

82.     Matthews and Williams Scotsman, C&I Maintenance, John Thompson and/or John Thompson & Associates, Inc., and other contractors and persons combined and agreed to enter a conspiracy against Chevron U.S.A.

83.     The purpose of their agreement and conspiracy was to charge Chevron U.S.A. excessive mark ups that were not earned or allowed under their agreements with Chevron U.S.A. and to cause Chevron U.S.A. to pay contractors for work that was never performed.

84.     Williams Scotsman, C&I Maintenance, John Thompson and/or John Thompson & Associates, Inc., and other contractors and persons also engaged in multiple and repeated unlawful acts in furtherance of the agreement and conspiracy, which acts are set forth throughout this complaint and also detailed in Counts I and II.

85.     The conspiracy between Matthews, Williams Scotsman, C&I Maintenance, John Thompson and/or John Thompson & Associates, Inc., and other

contractors and persons injured Chevron U.S.A. by causing Chevron U.S.A. to pay contractors excessive mark ups that were not earned or allowed under their agreements with Chevron U.S.A. and by paying contractors for work that was never performed.

86.     As a result of this unlawful agreement, Chevron U.S.A. has been damaged at an amount to be determined by trial.

**<u>Count IV</u>**
**(Unjust Enrichment)**

87.     Chevron U.S.A. repeats and realleges paragraphs 1 through 38 above, as if set forth in full here.

88.     As described throughout this complaint and also detailed in Counts I, II, and III, Matthews's fraudulent or negligent acts and omissions caused Chevron U.S.A. to hire and pay contractors and subcontractors excessive mark ups that were not earned or allowed under their agreements with Chevron U.S.A. and pay contractors for work that was never performed.

89.     Matthews received kickback payments, personal favors, and other improper benefits from those contractors and subcontractors in exchange for his steering contracts and payments to them.

90.     Matthews was not entitled to receive or retain those payments, which rightfully belong to Chevron U.S.A.

91.     As a result of Matthews's fraudulent and negligent acts and omissions, Matthews has been unjustly enriched at the expense of Chevron U.S.A., and the

circumstances dictate that, in equity and good conscience, the money that Matthews acquired should be returned to Chevron U.S.A.

**Count V**
**(Conversion)**

92.     Chevron U.S.A. repeats and re-alleges paragraphs 1 through 38 above, as if set forth in full here.

93.     As described throughout this complaint and also detailed in Counts I, II, and III, Matthews had no right to direct or allow contractors or subcontractors to be paid for work that was not actually performed for Chevron U.S.A.

94.     Matthews intentionally and without authorization caused other persons with no right to possession, including contractors and subcontractors who paid Matthews kickbacks or provided other favors to Matthews, to take possession of Chevron U.S.A.'s property (including funds), thereby wrongfully depriving Chevron U.S.A. of its property.

95.     Matthews intentionally and without authorization took possession of Chevron U.S.A.'s property (including funds) by steering unauthorized payments through contractors and subcontractors to himself in the form of kickbacks paid out of Chevron U.S.A. funds, thereby wrongfully depriving Chevron U.S.A. of its property.

96.     Matthews's acts constitute conversion of Chevron U.S.A.'s property.

## Count VI
### (Fraudulent Concealment)

97.     Chevron U.S.A. repeats and re-alleges paragraphs 1 through 38 above, as if set forth in full here.

98.     Matthews took affirmative steps to conceal his fraudulent and tortious conduct from Chevron U.S.A.  Among other things and as described elsewhere in this Complaint:

> a.     Matthews hid from Chevron U.S.A. his conflict-of-interest relationships with contractors because he knew that, if Chevron U.S.A. had known about those relationships, his supervisors would have scrutinized his contracts and discovered his fraud;

> b.     Matthews approved invoices and had Chevron U.S.A. pay for work that Matthews knew, and was the only Chevron U.S.A. employee who could have known, was not actually performed by the contractor that received payment;

> c.     Matthews directed contractors to "pad" invoices with mark-ups and directed that the padded invoices be paid by Chevron U.S.A. even though Matthews knew, and was the only Chevron U.S.A. employee who could have known, that the mark-ups had not been earned by the contractors;

> d.     Matthews directed subcontractors to create fraudulent invoices and submit those invoices through other contractors for payment by Chevron U.S.A. for work that Matthews knew, and was the only

23

Chevron U.S.A. employee who could have known, was not actually performed by the contractor that received payment;

99.     Because of Matthews's affirmative acts of concealment, Chevron U.S.A. did not and could not have discovered Matthews's fraudulent and tortious conduct until it had reason to and did terminate Matthews in July 2016.

100.    Matthews's conduct constitutes fraudulent concealment of his fraudulent and tortious conduct.

## Prayer for Relief

Wherefore, Chevron U.S.A. prays that judgment be entered in its favor and against Defendant Ted (Darin) Matthews as follows:

1.     With respects to all counts, that judgment be entered against defendant.

2.     For actual and compensatory damages according to proof;

3.     For restitution and disgorgement;

4.     For punitive damages;

5.     For pre- and post-judgment interest as provided by law;

6.     For reasonable attorneys' fees and costs as allowed by law, including the fees Chevron U.S.A. incurred in investigating Matthews's illegal conduct ; and

7.     For such further relief as the Court deems just and proper.

## Demand for Jury Trial

Chevron U.S.A. hereby demands, pursuant to Fed. R. Civ. P. 38(b), a trial by jury on all issues so triable.

*Michael J. Bentley*

Michael J. Bentley, Bar No. 102631
Bradley Arant Boult Cummings, LLP
188 East Capitol Street
Post Office Box 1789
Jackson, Mississippi 39215-1789
Phone:  (601) 948-8000
mbentley@bradley.com

*Attorney for Chevron U.S.A. Inc.*